## Howland & Aspinwall *vs.* Myer.

A mutual insurance company was authorized by its charter, for the better security of its dealers, to take premium notes in advance of persons intending to receive policies, and to negotiate such notes for the purpose of paying claims or otherwise in the course of its business. *Held,* under this provision, that a note given to the company for premiums in advance, was a valid security, and might be transferred to a party, who had insured in the company, on account of a claim for a loss.

And *held further,* that a transfer of the note by the president of the company was valid, without a previous resolution of the board of directors; he being authorized by the by-laws to make contracts and transact the ordinary business of the company.

APPEAL from the superior court of the city of New-York, where Howland & Aspinwall brought assumpsit against Theodore A. Myer The cause was tried before SANDFORD, J. without a jury, in June, 1848 and on the trial the plaintiffs gave in

evidence and claimed to recover upon a promissory note as follows :

" $3698,40.                              New-York, May 1, 1846.

Twelve months after date, I promise to pay the Alliance Mutual Insurance Company or order, for value received, thirty-six hundred and ninety-eight dollars and forty cents.

T. A. MYER."

(Endorsed)   " Pay Messrs. Howland & Aspinwall or order.
The Alliance Mutual Insurance Company.
JAMES D. P. OGDEN, President."

The Alliance Mutual Insurance Company was chartered by an act of the legislature of this state passed April 10, 1843, (*Stat. p.* 71.)   The 12th section provides " that the company, for the better security of its dealers, may receive notes for premiums in advance, of persons intending to receive its policies, and may negotiate the same for the purpose of paying claims or otherwise in the course of its business."   It was proved that the above mentioned note was given by the defendant as a subscription or premium note in advance, under the said 12th section and for the purpose therein mentioned ; that on the 19th of February, 1847, it was transferred by the president of the company to the plaintiffs in the ordinary course of business, on account of a loss which was a valid claim against the company. It did not appear that there had been any previous resolution of the board of directors authorizing the transfer.   The plaintiffs, when they took the transfer, had no notice of any want of authority in the president, and they dealt with him as the authorized agent of the company.   The company failed and became insolvent in May, 1847, and its affairs passed into the hands of a receiver.

Upon these facts the judge ruled that the note was valid in the hands of the company, and might be negotiated to pay its losses ; that the possession of the note by the plaintiffs not being *mala fide,* and not appearing to be contested by the receiver, they were entitled to recover.   The plaintiffs accordingly had a verdict, and after final judgment the defendant appealed to this court.

*W. Kent*, for appellant.

*S. Beardsley*, for respondents.

GARDINER, J. The note in question was a valid security in the hands of the insurance company, the original holders, and could have been enforced by them against the defendant. (*Deraismes* v. *The Merch. Mutual·Ins. Company*, 1 *Comst.* 371.)

Was it duly transferred by the insurance company to the plaintiffs? is the question in the present case. The 12th section of the act under which this company was incorporated provides "that the company, for the better *security* of its dealers, may receive notes for premiums in advance, of persons intending to receive its policies, and may negotiate the same for the purpose of *paying* claims or *otherwise*, in the *course* of its *business*." (*Sess. Laws* 1843, *p.* 71.) These powers were essential to the existence of incorporations of this sort. It was anticipated that their capital would consist chiefly of notes, received for premiums, and that unless they were rendered available, the corporations would be compelled to suspend operations, upon the first serious loss that occurred. They were therefore authorized to negotiate their premium notes, for the purpose of paying claims, or *otherwise*, in the course of their business.

The judge ruled that the testimony established "that this note was transferred to the plaintiffs by the president of the company, for a loss, in the usual way, and in the ordinary course of business; according to their custom to pay in notes." As there was evidence tending to prove these facts, the finding of the judge is conclusive, and the negotiation of this note is accordingly brought within the very letter of the 12th section.

But if the facts had been otherwise, I apprehend that the company were not restricted by the statute, to a negotiation for the purpose of payment, exclusively. They might procure the note to be discounted, and apply the avails, in discharge of their responsibility for losses incurred; or if this could not be done, the same result might be obtained by a transfer of the notes to the plaintiff, upon the indorsement of the company, the creditor

Howland *v.* Myer.

giving time until the securities matured.   In a word, any bona
fide settlement of a presumed loss, contingent or absolute, made
with the dealers of the company, in the usual course of business,
was, I think, authorized by the comprehensive language of the
statute. .

It is however objected, that the assignment of the president
was not obligatory upon the company.   Their corporate powers
were to be exercised according to their charter, by a board of
trustees and such other agents as they might appoint.   The
president was such agent.   This is manifest not only from the
general usage of the company, but from their by-laws, which
empower " the president, vice president, or either of them, to
make contracts for the corporation, to transact all its ordinary
business, and to perform whatever belongs to the executive de-
partment.   (1*st By-law*.)   The negotiation of notes in the
usual course of business was an act of this description; and it
is accordingly found as a fact, that " the plaintiff dealt with the
president as the authorized agent of the company, in the usual
way, and without notice."

The 8th section of the article to prevent the insolvency of
moneyed incorporations, it is said, prohibits this transfer, as it
was not authorized by a previous resolution of the board of di-
rectors.   (1 *R. S.* 591, § 8.)   To this objection there are two an-
swers.   First. If the 8th section conflicts with the charter of this
company, the former must yield to the latter, as the last expres-
sion of the legislative will.   Second. There is evidence to show .
that the policy was surrendered by the plaintiffs at the time of
the adjustment of the loss, and in consideration of the assign-
ment of the securities in question.   As the judge reports the
facts, " the plaintiffs were in possession of the notes honestly
and fairly, for a good claim, without notice of any want of
authority in the president to make the transfer."   Assuming
these facts to be true, the plaintiffs were bona fide holders of the
note for a valuable consideration, without notice, and conse-
quently not within the exception established by the section of
the revised statutes above mentioned.   The provision is, that
the section shall not be so construed as to render void any assign-

ment or transfer, in the hands of a purchaser for a valuable consideration and without notice. The judgment of the superior court must be affirmed.

Judgment affirmed.